MICHAEL MOE & others[1] *vs.* SEX OFFENDER REGISTRY BOARD.

Suffolk. December 5, 2013. - March 26, 2014.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Sex Offender. Sex Offender Registration and Community Notification Act. Constitutional Law,* Sex offender. *Due Process of Law,* Sex offender, Retroactive application of statute, Class action. *Practice, Civil,* Sex offender, Class action, Injunctive relief. *Statute,* Retroactive application. *Injunction. Internet.*

This court concluded that amendments to G. L. c. 6, §§ 178D and 178K, that became effective on July 12, 2013, requiring publication on the Internet of the sex offender registry information of individuals who were finally classified as level two sex offenders, were retroactive in operation as applied to persons who were classified as level two sex offenders on or before the date of the amendments' enactment [606-609]; that the Legislature intended that the amendments apply retroactively [609-610]; and that the retroactive application of the amendments violated due process under the Massachusetts Declaration of Rights [610-616].

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on July 5, 2013.

The case was reported by *Gants,* J.

*Ryan M. Schiff,* Committee for Public Counsel Services (*Dana Golblatt,* Committee for Public Counsel Services, with him) for the plaintiffs.

*John M. Stephan,* Assistant Attorney General, for the defendant.

*Eric Tennen,* for Massachusetts Association for Treatment of Sexual Abusers, amicus curiae, submitted a brief.

GANTS, J. On July 12, 2013, the Governor signed into law various amendments to G. L. c. 6, §§ 178C-178Q, the sex offender registry law (SORL), including amendments that would

---

[1]Nathan Noe, Peter Poe, Robert Roe, and Steven Soe, individually and on behalf of all others similarly situated. The single justice allowed a motion for the plaintiffs to proceed under pseudonyms.

require the Sex Offender Registry Board (SORB) to publish on the Internet information contained in the sex offender registry (registry information) regarding all individuals given a level two or level three classification by SORB. See St. 2013, c. 38, §§ 7, 9. Before these amendments were enacted, § 178D required SORB to publish on the Internet the registry information of sex offenders given a level three classification, but expressly prohibited SORB from publishing on the Internet the registry information of level two offenders. The issues presented are whether the amendments are retroactive in effect "for the purposes of further constitutional inquiry," as applied to those who were classified as level two offenders on or before the date of the amendments' enactment, see *Doe, Sex Offender Registry Bd. No. 8725* v. *Sex Offender Registry Bd.*, 450 Mass. 780, 787 (2008) (*Doe No. 8725*); whether the Legislature intended that they apply retroactively; and, if so, whether their retroactive application would violate due process under the Massachusetts Declaration of Rights. We conclude that the amendments are retroactive in effect as applied to level two offenders who were classified on or before the date of the amendments' enactment and that the Legislature intended such retroactive application, but that such retroactive application would violate State constitutional due process.[2]

*History of the case.* On July 5, 2013, after the Legislature had passed the amendments but before the Governor had signed them into law, the named plaintiffs, as putative representatives of the class of all persons presently and prospectively classified as level two sex offenders, filed in the county court a complaint for declaratory and injunctive relief. The complaint sought a preliminary and permanent injunction barring SORB from publishing registry information on the Internet of the class of level two offenders, as well as a declaratory judgment, and was accompanied by a motion for a preliminary injunction. On July 25, 2013, the single justice allowed the motion of the plaintiff class[3] to the extent that he preliminarily enjoined SORB from

---

[2] We acknowledge the amicus brief filed by the Massachusetts Association for Treatment of Sexual Abusers.

[3] The single justice allowed the plaintiffs' motion for class certification only for purposes of the preliminary injunction motion.

publishing on the Internet the registry information of any individual who had been finally classified as a level two sex offender on or before July 12, 2013, pending final adjudication of this proceeding.[4] The single justice denied the plaintiff class's motion to preliminarily enjoin SORB from publishing on the Internet the registry information of any individual who had been given a final classification as a level two sex offender after July 12, 2013. The single justice also reserved and reported the plaintiffs' complaint for declaratory and injunctive relief to a full panel of this court for final adjudication, provided the parties filed with the county clerk a statement of stipulated facts, which they did.

On September 9, the single justice allowed the plaintiffs' motion to file an amended complaint that narrowed the scope of the putative class to include only those who were classified as a level two sex offender on or before July 12, 2013 (the effective date of the amendments) and, as a consequence, narrowed the scope of the relief sought. With the filing of the amended complaint, the plaintiffs seek an injunction that effectively would make the preliminary injunctive relief permanent, and a judgment declaring that Internet publication of the registry information of level two sex offenders classified on or before July 12 would violate the United States and Massachusetts Constitutions.

*Background.* As amended in 1999, St. 1999, c. 74, § 2, the SORL established a sex offender registration system in the Commonwealth of those convicted of a sex offense, as defined in G. L. c. 6, § 178C. Unless otherwise ordered by a court pursuant to G. L. c. 6, § 178E (*e*) or (*f*), sex offenders are required to register with SORB within five days of receiving a sentence on a conviction or juvenile adjudication. G. L. c. 6, § 178E (*a*). "Upon review of any information useful in assessing the risk of reoffense and the degree of dangerousness posed to the public by the sex offender, including . . . any materials submitted by the sex offender, [SORB prepares] a recommended classification of each offender." G. L. c. 6, § 178L (1). If an

---

[4]Although the contested amendments became effective immediately on enactment, SORB agreed to defer implementation until the motion for a preliminary injunction was decided by the single justice, so no publication on the Internet of the registry information of level two offenders classified on or before July 12, 2013, has yet occurred.

offender contests SORB's recommended classification, after a hearing conducted pursuant to guidelines established by SORB, a panel of three SORB members or a hearing examiner designated by SORB must issue a decision that finally classifies a sex offender into one of three "levels of notification depending on the degree of risk of reoffense and the degree of dangerousness posed to the public by the sex offender." G. L. c. 6, § 178K (2). See G. L. c. 6, § 178L (2). "Where [SORB] determines that the risk of reoffense is low and the degree of dangerousness posed to the public is not such that a public safety interest is served by public availability, it shall give a level [one] designation to the sex offender." G. L. c. 6, § 178K (2) (*a*). "Where [SORB] determines that the risk of reoffense is moderate and the degree of dangerousness posed to the public is such that a public safety interest is served by public availability of registration information, it shall give a level [two] designation to the sex offender." G. L. c. 6, § 178K (2) (*b*). "Where [SORB] determines that the risk of reoffense is high and the degree of dangerousness posed to the public is such that a substantial public safety interest is served by active dissemination, it shall give a level [three] designation to the sex offender." G. L. c. 6, § 178K (2) (*c*). Neither "public availability" nor "active dissemination" is a defined term in the SORL, but their meaning can be discerned from the extent of public access to information associated with each term.

Under the SORL, as amended in 1999, the "public availability of registration information" applicable to level two offenders under G. L. c. 6, § 178K (2) (*b*), was limited to two types of information requests, each of which could only be made by a person "who [was eighteen] years of age or older and who state[d] that he [was] requesting sex offender registry information for his own protection or for the protection of a child under the age of [eighteen] or another person for whom the requesting person has responsibility, care or custody." G. L. c. 6, §§ 178I, 178J.[5] See G. L. c. 6, § 178K (2) (*b*), as amended through St. 1999, c. 74, § 2 ("The public shall have access to

---

[5]In 1997, we considered whether a trial judge was correct in issuing a preliminary injunction preventing the previous version of G. L. c. 6, § 178I, as appearing in St. 1996, c. 239, § 1, from going into effect. Under that ver-

the information regarding a level [two] offender in accordance with the provisions of [§§] 178I and 178J"). Under the first type of information request, provided for in § 178I, an adult may identify an individual, by name or otherwise, and ask SORB to indicate whether the individual is a sex offender. Under the second type, that provided for in § 178J, an adult who appears in person at a police station may make a similar request regarding an identified individual or may ask whether any sex offender resides, works, or attends "an institution of higher learning" within that city or town and, if so, obtain, among other information, the name, home address, and work address of the sex offender and, if available, a photograph of the sex offender.[6] Even after enactment of the contested amendments, such information is only available, on public inquiry, for offenders given a level two or a level three classification. See G. L. c. 6, §§ 178I, 178J.

In contrast, under the SORL, as amended in 1999, the "active dissemination" of sex offender information referenced in G. L. c. 6, § 178K (2) (c), involved a "community notification plan" in which police departments in the communities where a level three sex offender resided or worked were required to "notify organizations in the community which [were] likely to encounter such sex offender and individual members of the public who [were] likely to encounter such sex offender." G. L. c. 6, § 178K (2) (c). In addition, "[n]eighboring police districts

sion of the statute, a person requesting such information from SORB was not required to state that he or she was requesting the registry information for his or her own protection or for the protection of a child or another person under his or her care. In affirming the issuance of the injunction, we concluded that because "[a]ny adult, merely by presenting identification, [could] obtain sex offender registry information from [SORB] for any reason or for no reason at all, . . . [SORB]'s disclosures under § 178I [were] not limited to serving some worthy public purpose." *Doe* v. *Attorney Gen. (No. 2)*, 425 Mass. 217, 221 (1997). In St. 1999, c. 74, § 2, the Legislature amended § 178I to require that a person seeking sex offender information affirm that he or she was requesting the information for his or her own protection, or for the protection of a child or another person in his or her care or custody.

[6]Those requesting information at a police station are also required to "present proper identification" and "complete and sign a record of inquiry . . . which shall include . . . the name and address of the person making the inquiry, the person or geographic area or street which is the subject of the inquiry, the reason for the inquiry and the date and time of the inquiry." G. L. c. 6, § 178J (2), (4).

[were required to] share sex offender registration information of level [three] offenders and [could] inform the residents of their municipality of a sex offender they [were] likely to encounter who reside[d] in an adjacent city or town." *Id.*

The SORL, as amended in 1999, did not provide for Internet publication of any information regarding any sex offender. Internet publication of registry information was first required through an amendment to G. L. c. 6, § 178D, in 2003, St. 2003, c. 140, § 5, but was limited to registry information regarding level three offenders. The 2003 amendment specifically prohibited Internet publication of registry information of level two offenders.[7] Therefore, until July 12, 2013, the "public availability of registration information" regarding level two offenders did not include Internet publication of registry information. The contested amendments at issue in this case effectively revise the definition of "public availability of registration information" to include Internet publication, because they make the registry information of level two offenders publicly available on the Internet where it previously had been explicitly unavailable.[8]

Of the 11,171 sex offenders registered with SORB as of July

---

[7]The amendment added the following language to G. L. c. 6, § 178D:

> "Notwithstanding [§§] 178C to 178P, inclusive, or any other general or special law to the contrary and in addition to any responsibility otherwise imposed upon [SORB], [SORB] shall make the sex offender information contained in the sex offender registry . . . available for inspection by the general public in the form of a comprehensive database published on the internet, known as the 'sex offender internet database'; provided, however, that *no registration data relating to a sex offender given a level [one] or level [two] designation by [SORB] under [§] 178K shall be published in the sex offender internet database* but may be disseminated by [SORB] as otherwise permitted by said [§§] 178C to 178P, inclusive . . ." (emphasis added).

St. 2003, c. 140, § 5.

[8]Two amendments effectively accomplish this redefinition of "public availability of registration information" for level two offenders. First, St. 2013, c. 38, § 7, provides that G. L. c. 6, § 178D, is amended to read in pertinent part: "no registration data relating to a sex offender given a level [one] designation by [SORB] under [§] 178K shall be published in the sex offender internet database." As a result, this restriction no longer applies to offenders given a level two designation. Second, St. 2013, c. 38, § 9, provides that G. L. c. 6, § 178K, is amended such that, where it previously stated that

12, 2013, registry information is currently available on the Internet for only the 2,422 level three offenders, a group that comprises approximately 21.7 per cent of registered sex offenders. Were the recent amendments to become effective, the number of offenders whose registry information is publicly available would rise to 8,496, approximately 76.1 per cent of the sex offenders registered with SORB.

Implicit in the earlier prohibition against Internet publication of the registry information of level two offenders and the existing prohibition against the publication of the registry information of level one offenders is the recognition by the Legislature that public identification of a sex offender poses a risk of serious adverse consequences to that offender, including the risk that the sex offender will suffer discrimination in employment and housing, and will otherwise suffer from the stigma of being identified as a sex offender, which sometimes means the additional risk of being harassed or assaulted. See *Doe* v. *Attorney Gen. (No. 2)*, 425 Mass. 217, 221-222 (1997) (*Doe [No. 2]*) (without safeguards as to who can access sex offender information, "[t]he possibility exists . . . that a person with no remedial motive will obtain sex offender registry information and reveal it to the plaintiff's detriment. The potential harm to the plaintiff in his employment or in his community, or both, from the use of such information for other than personal protection is substantial"). Cf. *Poe* v. *Sex Offender Registry Bd.*, 456 Mass. 801, 813 (2010), quoting *Doe* v. *Attorney Gen.*, 426 Mass. 136, 144 (1997) ("Classification and registration entail possible harm to a sex offender's earning capacity, damage to his reputation, and, 'most important, . . . the statutory branding of him as a public danger' ").

The best evidence that the Legislature recognized this risk is its enactment of G. L. c. 6, § 178N, which provides that "[i]nformation contained in the sex offender registry shall not be used to commit a crime against a sex offender or to engage

"[t]he public shall have access to the information regarding a level [two] offender in accordance with the provisions of [§§] 178I and 178J," it now provides that the public shall have access to level two sex offenders' registry information "in accordance with the provisions of [§§] 178D, 178I and 178J."

in illegal discrimination or harassment of an offender."[9] See G. L. c. 6, §§ 178D, 178I, 178J (requiring that those seeking registry information be warned regarding criminal penalties for use of such information to commit crime or engage in "illegal discrimination or harassment of an offender").

Publication of registry information on SORB's Web site substantially increases the risk of public identification for at least three reasons. First, to obtain registry information under either G. L. c. 6, §§ 178I or 178J, a person must identify himself or herself and make a specific request for information about a particular person or about level two or three sex offenders in a particular city or town. In contrast, to obtain registry information from SORB's Web site, persons may remain anonymous, seek information regarding every level two and level three sex offender in the Commonwealth, and conduct this search from the comfort of their home, at any time of day or night. Second, once a sex offender's registry information is published on SORB's Web site, it is likely to be republished on other Web sites that are not controlled by SORB that publicly identify sex offenders, and that do not include the same warnings or certifications provided on SORB's Web site as required by statute or SORB regulation. Third, because a sex offender's name is published on SORB's Web site and on such unrelated private Web sites, a person searching for that individual on the Internet through one of the usual search engines, such as Google, may learn that the individual is a sex offender, even if that was not the reason for the Web search, because the search results may include "hits" to private Web sites listing sex offenders. See D.J. Solove, The Future of Reputation: Gossip, Rumor, and Privacy on the Internet 78 (2007) ("When one puts information on the Internet, it can easily become like Frankenstein's monster, escaping the dominion of its master").[10]

---

[9]Although G. L. c. 6, § 178N, prohibits the use of registry information "to engage in illegal discrimination" of a sex offender, we know of no law or regulation prohibiting such discrimination. Nor are sex offenders a class constitutionally protected against such discrimination. Consequently, we find § 178N to be relevant not because it has any practical effect in preventing such discrimination, but because it reflects the recognition that sex offenders suffer such discrimination.

[10]We recognize that, in Coe v. Sex Offender Registry Bd., 442 Mass. 250,

The evidentiary record also demonstrates that the injury to members of the class that could arise from Internet publication would likely be irreparable, even if SORB were later to reduce their classification to level one or release them from the obligation to register. See G. L. c. 6, § 178G (authorizing SORB to terminate obligation to register for certain sex offenders under certain circumstances); 803 Code Mass. Regs. § 1.37C (2013) (offender may seek reclassification three years after final classification). Once the plaintiffs' registry information is published on SORB's Web site, there is a substantial likelihood that they would soon be identified on private Web sites listing sex offenders, and that the subsequent removal of their names from SORB's Web site would not result in the removal of their names from these private Web sites. See *Doe (No. 2)*, *supra* at 222 (once sex offender information is obtained and distributed with no remedial motive, "at best it will not easily be remediable").

*Discussion.* Where a party argues, as the plaintiffs do here, that a statute is impermissibly retroactive, we must resolve three distinct but related questions. Preliminarily, we must determine whether the law, as amended, has a retroactive effect. If not, and assuming the law is otherwise constitutional, no further inquiry is necessary. If the statute is retroactive, we look to see whether the Legislature clearly intended it to be retroactive. Where it so intended, we determine whether retroactive application is constitutional.

1. *Do the amendments operate retroactively?* We first examine whether G. L. c. 6, § 178D, as amended on July 12, 2013, is retroactive in operation insofar as it requires SORB to publish the registry information of level two offenders on its Web site, whereas before July 12, 2013, under § 178D, it was expressly

257 n.6 (2004), we stated that any consequences to level three sex offenders that occur after Internet publication of such offenders' registry information "cannot be said to be exacerbated by Internet dissemination when the information available on the Internet is already accessible, or is actively disseminated, under" G. L. c. 6, §§ 178I, 178J, and 178K (2) (c). That statement may no longer be accurate for level three offenders in light of all that we have learned about the operation of the Internet since 2004. But it is certainly not true about Internet publication of the registry information of level two offenders, who are not subject to active dissemination of registry information under G. L. c. 6, § 178K (2) (c).

barred from publishing such information on its Web site. "A statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment . . . or upsets expectations based in prior law." *Federal Nat'l Mtge. Ass'n* v. *Nunez*, 460 Mass. 511, 522 (2011), quoting *Landgraf* v. *USI Film Prods.*, 511 U.S. 244, 269 (1994). Rather, the United States Supreme Court has declared that a statute is retroactive in effect where "the new provision attaches new legal consequences to events completed before its enactment." *Landgraf, supra* at 270. Determining whether "a particular rule operates 'retroactively' comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event." *Id.* The Supreme Court recognized that its test "is unlikely to classify the enormous variety of legal changes with perfect philosophical clarity," but noted that "familiar considerations of fair notice, reasonable reliance, and settled expectations offer sound guidance." *Id.* See *Immigration & Naturalization Serv.* v. *St. Cyr*, 533 U.S. 289, 321 (2001), quoting *Martin* v. *Hadix*, 527 U.S. 343, 357 (1999) ("The inquiry into whether a statute operates retroactively demands a commonsense, functional judgment . . .").

We have adopted the Supreme Court's "new legal consequences" test in deciding whether Massachusetts statutes operate retroactively. See *Doe No. 8725*, 450 Mass. at 787 (registration law "must be considered retroactive" because it "attaches new legal consequences to events that occurred before its enactment"); *Commonwealth* v. *Bruno*, 432 Mass. 489, 498 (2000) (applying " 'new consequence' formulation of retroactivity"). See also *Nunez*, 460 Mass. at 522 (citing *Landgraf* "new legal consequences" test).

The Commonwealth argues that the appropriate test of retroactivity is the test we applied in *McCarthy* v. *Sheriff of Suffolk County*, 366 Mass. 779, 781 (1975), where we stated:

> "In order to determine whether a statute is retroactive, it is necessary to look at the rights and obligations of the parties as they existed immediately before and after the effec-

tive date thereof. It is only where vested substantive rights of the parties have been adversely affected that we can say a statute operates retroactively, and it is only then that we need analyze the nature of the governmental interest involved in order to determine whether the statute, as applied, violates due process."

The *McCarthy* "vested substantive rights" test was formulated nineteen years before *Landgraf*'s new legal consequences test, and we have gradually abandoned the *McCarthy* test in favor of the *Landgraf* test. The last time we cited *McCarthy* with respect to its retroactivity analysis was fourteen years ago, and that was in *Bruno*, 432 Mass. at 498, where we applied the new legal consequences test.

The impairment of a vested substantive right certainly qualifies as a new legal consequence that would render a statute retroactive, but it is not the only new legal consequence that would do so. In *Doe No. 8725*, 450 Mass. at 787, we concluded that G. L. c. 6, § 178K (2) (*d*), operated retroactively to the extent that it provided that persons who were convicted of a "[s]exually violent offense," as defined in G. L. c. 6, § 178C, before the enactment of § 178K (2) (*d*), could not be relieved by SORB of the obligation to register, regardless of their risk of reoffense or degree of dangerousness. A sex offender convicted of a "[s]exually violent offense" had no vested substantive right to SORB's exercise of discretion regarding the obligation to register as a sex offender, but we nonetheless concluded that the conclusive statutory presumption of risk to reoffend implicit in § 178K (2) (*d*) was a new legal consequence of the earlier conviction that rendered the statute retroactive in effect. *Id.* Similarly, in *Anderson* v. *BNY Mellon, N.A.*, 463 Mass. 299, 306 (2012), we concluded that the 2009 amendment to G. L. c. 210, § 8, was retroactive in effect even though we determined that "the plaintiff ha[d] no vested right in the operation of this statute."

Apart from the narrowness of its scope, the problem with the vested substantive rights test is that it conflates the question whether a retroactive statute is unreasonable in its application, and therefore unconstitutional, with the more appropriate question whether the statute is retroactive in operation and therefore

subject to constitutional analysis. "[I]t has long been recognized that the term 'vested right' is conclusory — a right is vested when it has been so far perfected that it cannot be taken away by statute." Hochman, The Supreme Court and the Constitutionality of Retroactive Legislation, 73 Harv. L. Rev. 692, 696 (1960). Consequently, as the Supreme Court of Texas stated, "The 'impairs vested rights' test . . . comes down to this: a law is unconstitutionally retroactive if it takes away what should not be taken away." *Robinson* v. *Crown Cork & Seal Co.*, 335 S.W.3d 126, 143 (Tex. 2010).

Under the new legal consequences test, the contested amendments are retroactive in operation, because they mandate a substantial new legal consequence (Internet publication of offender's registry information) to events completed on or before the date of their enactment (SORB's final determination that offender should be given level two classification) that previously had been expressly prohibited under G. L. c. 6, § 178D. In practice, the newly enacted amendments in this case transformed level two offenders into something akin to level "two and one-half" offenders, because what before was limited to level three offenders (Internet publication of their registry information) is now required for level two offenders.

2. *Did the Legislature intend retroactive operation of the amendments?* Having determined that the amendments are retroactive in operation, the next question we must address is whether the Legislature intended them to be retroactive. "As a general matter, 'all statutes are prospective in their operation, unless an intention that they shall be retrospective appears by necessary implication from their words, context or objects when considered in the light of the subject matter, the pre-existing state of the law and the effect upon existent rights, remedies and obligations.' " *Nunez*, 460 Mass. at 516, quoting *Fleet Nat'l Bank* v. *Commissioner of Revenue*, 448 Mass. 441, 448-449 (2007). "Such implication must be 'unequivocally clear.' " *Smith* v. *Massachusetts Bay Transp. Auth.*, 462 Mass. 370, 377 (2012), quoting *Sentry Fed. Sav. Bank* v. *Cooperative Cent. Bank*, 406 Mass. 412, 414 (1990). In the context of this case, the question is whether the Legislature intended Internet publication of registry information to apply retroactively to *all* level two offenders,

including those so classified by SORB on or before the effective date of the amendments, or whether it intended Internet publication to apply only prospectively to those given a final level two classification after the amendments became effective. We conclude that it "appears by necessary implication" that the Legislature intended the amendments to apply retroactively to all level two offenders, regardless of their date of classification.

General Laws c. 6, § 178D, as amended, defines the sex offender registry as "a central computerized registry of all sex offenders required to register." By amending § 178D to provide that "[SORB] shall make the sex offender information contained in the sex offender registry" of level two offenders "available for inspection by the general public" on SORB's Web site, the Legislature must have recognized that it was authorizing Internet publication of sex offender information regarding those who were classified as level two offenders on or prior to the date of the enactment of these amendments. Moreover, when the Legislature in 2003 amended the SORL to authorize Internet publication of registry information of level three offenders, it was applied retroactively to those who had been previously classified as level three offenders. There is no reason to believe that the Legislature intended that the recent amendments would be applied any differently.

3. *Does the retroactive operation of the amendments comport with due process?* Having determined that the amendments operate retroactively and that the Legislature intended them to be retroactive, we must address the question whether their retroactive operation is constitutional.

In *Doe No. 8725*, 450 Mass. at 786, quoting *Landgraf*, 511 U.S. at 266, we declared:

> "[R]etroactive statutes raise particular constitutional concerns. 'The Legislature's unmatched powers allow it to sweep away settled expectations suddenly and without individualized consideration. Its responsivity to political pressures poses a risk that it may be tempted to use retroactive legislation as a means of retribution against unpopular groups or individuals.' . . . This risk is acute in the context of people who have committed crimes that have a

sexual component, and who are frequently the target of public ire and scorn."

The constitutional entitlement to due process "protects the interests in fair notice and repose that may be compromised by retroactive legislation." *Landgraf, supra.* "While nonpunitive retroactive regulation is not unconstitutional per se, it nonetheless raises due process concerns." *Doe No. 8725, supra* at 788. Therefore, under our jurisprudence, "[r]etroactive laws must meet the test of 'reasonableness' to comport with State constitutional due process requirements." *Id.,* citing *American Mfrs. Mut. Ins. Co.* v. *Commissioner of Ins.,* 374 Mass. 181, 190 (1978). "Ultimately, the 'principal inquiry — as to reasonableness — is essentially a review of whether it is equitable to apply the retroactive statute against the plaintiffs.' " *Doe No. 8725, supra,* quoting *American Mfrs. Mut. Ins. Co., supra* at 191. See *St. Germaine* v. *Pendergast,* 416 Mass. 698, 704 (1993) ("fairness is the touchstone of due process" and retroactive application of statute "would offend fundamental fairness").

Because we presume that a statute is constitutional, the burden of proving the unconstitutionality of its retroactive application rests with the plaintiffs. See *Doe No. 8725,* 450 Mass. at 788. In light of the special risks posed by retroactive application, the plaintiffs' burden, as noted, is to prove that retroactive application of the statute would be unreasonable and therefore inequitable, not that the statute has no rational basis. See *id.* Retroactive legislation has "to meet a burden not faced by legislation that has only future effects. 'It does not follow . . . that what Congress [or the Legislature] can legislate prospectively it can legislate retrospectively. The retroactive aspects of legislation, as well as the prospective aspects, must meet the test of due process, and the justifications for the latter may not suffice for the former.' " *Pension Benefit Guar. Corp.* v. *R.A. Gray & Co.,* 467 U.S. 717, 730 (1984), quoting *Usery* v. *Turner Elkhorn Mining Co.,* 428 U.S. 1, 16-17 (1976). "In determining whether the application is equitable — and thus whether the regulation is reasonable — we examine the statute from three perspectives: 'the nature of the public interest which motivated the Legislature to enact the retroactive statute; the nature of the

rights . . . affected retroactively; and the extent or scope of the
statutory effect or impact,' " and then we balance these various
perspectives. *Doe No. 8725, supra*, quoting *American Mfrs.
Mut. Ins. Co.*, 374 Mass. at 191.

Examining the amendments from two of these three perspec-
tives is rather simple. As to the public interest that motivated
the Legislature to enact the retroactive statute, it is apparent that
the purpose of the amendments was to make it easier for mem-
bers of the public to access registry information related to level
two sex offenders, and presumably thereby to permit the public
better to defend themselves and those in their care from the risk
of sexual assault by these offenders.[11] As to the scope of the
contested amendments' impact, they would subject over 6,000
currently classified level two sex offenders to the likelihood of
permanent disclosure of their personal information and criminal
history on multiple Web sites, which, as discussed above, is
likely to result in their identification as sex offenders within
their communities, with all the harmful adverse consequences
that inevitably will flow from such identifications. Cf. *Doe No.
8725*, 450 Mass. at 792-793, quoting *Doe* v. *Attorney Gen.*, 426
Mass. 136, 149 (1997) (Fried, J., concurring), and *Smith* v. *Doe*,
538 U.S. 84, 117 (2003) (Ginsburg, J., dissenting) (concluding
that this factor weighs against finding retroactive application
reasonable where sex offender registration requirement "is
properly viewed as a 'continuing, intrusive, and humiliating
regulation of the person himself,' " and where such offender
"will remain subject to long-term monitoring and inescapable
humiliation").

The third perspective — the nature of the rights affected

---

[11]Although we recognize that the Legislature enacted these amendments in
the belief that Internet access to the registry information of level two offend-
ers would reduce the number of new sex crimes committed by these offenders
by enabling individuals to identify them as sex offenders and take cautionary
steps to protect themselves and those under their care, there is no evidence in
the record to indicate that any sex crime has been prevented, or that the
incidence of sex crimes or sex offender recidivism has decreased, by such
publication, even though Internet publication of the registry information of
level three offenders has been required in Massachusetts since 2003, and ap-
proximately forty-two States have posted sex offender information on some
form of State-sponsored Web site since 2004. See *Coe* v. *Sex Offender Registry
Bd.*, 442 Mass. 250, 260 n.10 (2004).

retroactively — requires far closer analysis. In *Coe* v. *Sex Offender Registry Bd.*, 442 Mass. 250 (2004), we in essence concluded that it was not inequitable to apply the 2003 amendment that authorized Internet publication of the registry information of level three offenders retroactively to those already classified as level three offenders. We noted that the fact "[t]hat there may be additional adverse consequences to the plaintiffs resulting from Internet dissemination of their sex offender registration information does not increase the State due process protection due to them." *Id.* at 257 (footnote omitted). The plaintiffs in that case argued that publication of their registry information on SORB's Web site violated art. 12 of the Massachusetts Declaration of Rights because " '[w]orld-wide [I]nternet dissemination is not "carefully calibrated" to serv[e] a public safety interest' and is overly broad because publication is not targeted to reach persons supposedly threatened by them," but we rejected their argument. *Id.* at 258. In doing so, we concluded that "the Legislature's choice of Internet dissemination of only level three sex offender registration information bears a real and substantial relation to protecting the public health and safety by notifying the public about dangerous offenders who live and work in the Commonwealth, and who are not necessarily residing or working in a potential victim's neighborhood or community." *Id.* at 258-259. Not surprisingly, SORB contends that the court's reasoning in *Coe* applies with equal force in this case.

There is, however, a fundamental difference between the circumstances in this case and those in *Coe*. The plaintiffs in *Coe* had been classified as level three sex offenders, the most dangerous category of offender, who, even before enactment of the amendment requiring Internet publication, were subject to "active dissemination" of their registry information through a community notification plan. See G. L. c. 6, § 178K (2) (*c*), as amended through St. 1999, c. 74, § 2. There could be no reasonable claim that SORB may have given any of these level three offenders a lower classification level had it recognized that the consequence of a level three classification was Internet publication of the offender's registry information, because a level three classification already carried with it the more invasive con-

sequence of "active dissemination" of the offender's registry information by the local police department where the offender lived, worked, or attended school. In contrast, the plaintiff class in this case is comprised of level two sex offenders, who were so classified because SORB "determine[d] that the risk of reoffense [was] moderate and the degree of dangerousness posed to the public [was] such that a public safety interest [was] served by public availability of [their] registration information." See G. L. c. 6, § 178K (2) (b). As earlier noted, until July 12, 2013, "public availability of registration information" was limited to the public access accorded by G. L. c. 6, §§ 178I and 178J, which require an individual personally to request specific information from SORB or a local police department; it did not include Internet publication, which was expressly prohibited for the registry information of level two sex offenders. See G. L. c. 6, § 178D, as amended through St. 2003, c. 140, § 5. Therefore, when SORB gave a sex offender a level two classification after the 2003 amendment, SORB implicitly determined that the offender was not so dangerous that the interest of public safety required Internet publication of the offender's registry information, because SORB would have given the offender a level three classification if it believed that Internet publication of the offender's registry information was warranted.[12] Thus, the practical consequence of the recent amendments is that offenders whose degree of dangerousness, according to SORB, was not so substantial that Internet publication of their information was needed to protect the public safety would now be subject to Internet publication of their registry information. And further, those offenders who did not challenge their level two classification, either administratively under G. L. c. 6, § 178L (2), or through judicial review under G. L. c. 6, § 178M, because they specifically relied on their accurate understanding that a level two clas-

---

[12]In addition to implicit determinations as to whether Internet publication is necessary to protect the public from a particular sex offender, we are aware of at least one case in which a hearing examiner made an *explicit* finding that Internet dissemination was necessary. See *Poe* v. *Sex Offender Registry Bd.*, 456 Mass. 801, 808 (2010) (hearing examiner found "circumstances sufficient to support a level three classification, because '*only Internet dissemination* [of his status as a sex offender] could adequately protect'" offender's potential victims [emphasis added]).

sification did not carry the consequence of Internet publication of their registry information, would now be subject to exactly that.

This inequity arises because the legal standard for the designation of a sex offender classification level under G. L. c. 6, § 178K, interweaves the risk of reoffense and the degree of dangerousness with the level of notification appropriate to protect the interests of public safety. Section 178K (1) delegates to SORB the task of promulgating guidelines that provide for "three *levels of notification* depending on [the] risk of reoffense and the degree of dangerousness posed to the public" (emphasis added). Pursuant to this authority, SORB promulgated regulations that provide that SORB, in making its initial classification recommendation and in issuing a final classification decision, is required to determine "whether and *to what degree* public access to the offender's personal and criminal history information, pursuant to [G. L.] c. 6, § 178K, is in the interest of public safety" (emphasis added). 803 Code Mass. Regs. §§ 1.22(3)(c), 1.39(3)(c) (2004). Therefore, in determining the appropriate classification level, SORB is determining what degree of public access to registry information is appropriate in light of the offender's risk of reoffense and degree of dangerousness. Increasing the scope of public access to include Internet publication of the registry information of level two offenders may affect that determination, even if it does not affect SORB's evaluation of an offender's degree of dangerousness, because SORB may decide that public access with Internet publication is not warranted by the public safety risk posed by the specific offender's degree of dangerousness.

Viewing the contested amendments from the three required perspectives, and having balanced those perspectives, we conclude that the plaintiffs have met their burden of demonstrating that retroactive application of the amendments to persons finally classified as level two offenders on or before July 12, 2013, would be unreasonable and inequitable, and therefore unconstitutional as a violation of due process. What shifts the balance in favor of the plaintiff class is that retroactive application would require Internet publication of the registry information of persons who SORB implicitly concluded were not so dangerous that their information needed to be published on the Internet to

protect the public safety, and who SORB may have classified as level one offenders if SORB had known that Internet publication would be a consequence of a level two classification. The inequity of retroactively applying the contested amendments to these level two offenders is aggravated by the risk, already attested to in the evidentiary record, that at least some of these offenders "acted in reasonable reliance upon the previous state of the law" in choosing not to challenge their level two classifications specifically because such classifications did not subject them to Internet publication of their registry information. See *Leibovich* v. *Antonellis*, 410 Mass. 568, 578 (1991).

*Conclusion.* We declare unconstitutional the retroactive application of the amendments to G. L. c. 6, §§ 178D and 178K, that became effective on July 12, 2013, to the extent they would require the Internet publication of the registry information of individuals who were finally classified as level two sex offenders on or before July 12, 2013. The matter is remanded to the county court for entry of an order allowing the plaintiffs' motion for class certification and permanently enjoining SORB from publishing on the Internet the registry information of any individual who was finally classified as a level two sex offender on or before July 12, 2013, unless the individual is subsequently reclassified a level two or level three sex offender. Nothing in this order affects the ability of SORB to publish on the Internet the registry information of any individual who was given a final classification as a level two sex offender after July 12, 2013.

*So ordered.*