TOWN OF SUDBURY & others[1] *vs.* COMMISSIONER OF
CORPORATIONS AND TAXATION & others.[2]

Suffolk.     November 7, 1974. — December 24, 1974.

Present: TAURO, C.J., REARDON, QUIRICO, BRAUCHER, HENNESSEY, KAPLAN, &
WILKINS, JJ.

*Taxation,* Real estate tax: assessment; Assessors; Commissioner of
    Corporations and Taxation; State Tax Commission.  *Equity Juris-*
    *diction,* Declaratory relief, Tax.

Discussion of the functions of municipal assessors, the Commissioner of
    Corporations and Taxation, and the State Tax Commission. [563-567]
Declaratory relief was appropriate to declare that the Commissioner of
    Corporations and Taxation has the power to require that local
    assessors take action to produce uniformity throughout the Com-
    monwealth in valuation and assessments of property at full "fair cash
    valuation"; the State Tax Commission may require from municipal
    officers such accurate statements of the assessment and value of
    property as will enable the commission to fulfill its duty to determine
    for the municipalities the equalized fair cash valuations of property
    which form the basis for apportioning the benefits of certain State aid
    and the burdens of county and other taxes; the functions of the
    commissioner and the commission in such respects are to command,
    not merely to advise or educate, and it is the duty of the municipal
    assessors to obey their lawful commands. [568-569]

BILL IN EQUITY filed in the Supreme Judicial Court for the
county of Suffolk on December 6, 1973.

The case was reserved and reported without decision by
*Hennessey,* J.

*David Lee Turner & Stuart DeBard* for the town of
Sudbury & others.

*Lawrence T. Bench,* Assistant Attorney General, for the
State Tax Commission.

---

[1] Residents, taxpayers and officials of the town.

[2] The associate commissioners. The three defendants constitute the State Tax
Commission. G. L. c. 14, § 2.

*Augustus F. Wagner, Jr.,* Town Counsel, town of Bourne, *Alan A. Green,* Town Counsel, town of Sandwich, & *Robert W. Harrington,* for the towns of Bourne and Sandwich, amici curiae, joined in a brief.

*Michael B. Elefante,* for City Solicitors and Town Counsel Association, amicus curiae, submitted a brief.

*Leonard E. Perry & James M. Cronin,* for the town of Dartmouth, amicus curiae, submitted a brief.

BRAUCHER, J.    We are asked to define the proper role of the Commissioner of Corporations and Taxation (commissioner) and the State Tax Commission (commission) in enforcing the constitutional and statutory duty of assessors to tax property at its full and fair cash value. See *Assessors of Lynn* v. *Shop-Lease Co. Inc.* 364 Mass. 569, 572 (1974), and cases cited. The commissioner and the commission contend that their functions are advisory and educational only, and not directive. See Rep. A. G., Pub. Doc. No. 12 (1964) 208, 210. We hold that declaratory relief is appropriate, and that the commissioner and the commission have underestimated their power and authority. We leave it to them to execute the laws, but retain jurisdiction in the county court so that they may make a report of progress in six months.

The plaintiffs are the town of Sudbury and some of its officials. They filed in the county court a bill in equity for declaratory and injunctive relief against the commissioner and the commission. The defendants filed a demurrer and an answer. A single justice of this court referred the case to a master, and later confirmed the master's report and reported the case to the full court without decision on the pleadings and the master's report. Fourteen cities and towns joined in the plaintiffs' reply brief as friends of the court and three additional towns filed two separate briefs. The City Solicitors and Town Counsel Association also filed a brief as friend of the court, concerned only with the implementation of any relief awarded.

1. *Master's findings.*    We summarize the master's findings. Partly as a result of a severe shrinkage in real estate values during the depression years of the 1930's, the

practice of fractional valuation of real estate for tax purposes became widespread, and until the decision in *Bettigole* v. *Assessors of Springfield,* 343 Mass. 223 (1961), most real estate in the Commonwealth was assessed at figures well below fair cash values as market values steadily increased. Since 1966 more than half of the 351 cities and towns in the Commonwealth have gone through a revaluation process, but others continue to assess at ratios well below full and fair cash value and to assess different classifications of real estate at different percentages of that value. Revaluation, often with the aid of an outside appraisal firm, is a one-shot performance, and in an inflationary economy is soon out-of-date, sometimes even within a year. The use of fractional assessments in some towns and full assessments in others discriminates against the elderly and others in the latter towns who are entitled to dollar amount exemptions on assessed value. G. L. c. 59, § 5.

As of January 1 of even-numbered years the commission establishes equalized valuations of taxable property for each city and town. For 1972 the assessment ratios (ratio of local assessed value to estimated full market value) ranged from 19% to 100%. The 1972 equalized valuations were in many instances well below full and fair market value, but they tended to approximate full and fair cash value in cities and towns which had caused revaluations to be made. Thus in each of nine towns which revalued in 1973, the 1972 equalized valuation was substantially exceeded by the 1973 assessed valuation; the total increase was more than 60%. Sudbury was one of the towns that assess property at or near its full and fair cash value.

The equalization process for 1974 was improved in quality, but there is no assurance that the final 1974 equalized valuations approximate full and fair cash values. Equalized valuations are largely based on the ratio of assessments to sales for each of four classifications of real estate — commercial, industrial, residential and vacant land. The determination of such ratios lacked precision in several respects. Sales data failed to supply sufficient

information to ensure that only arm's-length sales were used, the frequency of sales varied with the types of property, and sales of commercial and industrial property were inadequate in number. Appraisers were expected to make appraisals of commercial and industrial property in far less time than was needed. With the resources available for the preparation of the 1974 equalized valuations, those valuations are subject to serious reservations.

The equalized valuations established by the commission play an important part in determining substantial amounts to be distributed to each city and town as school aid, highway funds, and lottery funds, and in apportioning the burden of county and other taxes. The effect of a change in equalized valuation is shown in the case of Westborough, where the equalized valuation used for 1974 was almost double that used for 1972, the school aid percentage dropped from 40% to 15% (the minimum), and the dollar entitlement for school aid dropped from $1.1 million to $.4 million. The impact of such a change is also illustrated by the school aid entitlement of Sudbury. In 1974 Sudbury was entitled to $1.1 million on the basis of 1972 equalized valuations. The defendants calculated that, if the improved 1974 equalized valuations had been used, Sudbury would have been entitled to $1.7 million.

The commission has no long-range plan for staffing and electronics data processing. In addition to supplying to local assessors information on property tax laws and forms for reports, it has conducted voluntary training programs for them on valuation procedures and practices. It has not promulgated uniform standards for assessment at fair cash value nor have sanctions been invoked to enforce such assessment. In June, 1973, it warned delinquent assessors that failure to file required information would result in loss of the right to appeal proposed equalized valuations. G. L. c. 58, § 10. No steps have been taken to suspend or remove an assessor for failure to assess property at full and fair cash value. No commissioner has issued a formal report on the performance of assessors to their mayor or selectmen.

Experience in other States demonstrates that under the

authority of a court decision or a statute the State department of taxation can enforce acceptable uniformity in local assessment practices, can substantially accelerate the trend toward local assessment at full and fair cash value, and can through refinement of the equalization process produce equalized valuations with acceptable uniformity and within acceptable reach of full and fair cash value. The master made detailed findings with respect to Kentucky, New Jersey and Wisconsin.

The commissioner and the commission interpret their role in the administration of the work of local assessors as advisory and educational rather than as directory. If so directed and if given the necessary resources, they would undertake to compel changes in local assessing practices, where necessary, with the intent of achieving full and fair cash valuation, and to refine the equalization process in order to produce equalized valuations with acceptable uniformity, and within acceptable reach of full and fair cash value. Given the authority to compel local assessors to assess property at its full and fair cash value, the commissioner and the commission would need increased funding, more personnel, and resources such as computer assistance to do a satisfactory job.

The time and resources necessary for satisfactory improvement in assessment and equalization are matters of estimate and would vary with the methods adopted. Property-by-property appraisals in communities assessing well below full and fair cash value would take several years and would soon become obsolete in a rapidly rising market. A system assuring yearly updating would require careful study and report from qualified experts, expansion of the capabilities of the responsible bureau, and its continuing intensive effort. A reasonable estimate of time for this approach is four years. Percentage adjustments in the various classifications of real estate, based on reasonably current ratios of assessments to sales, could be achieved within a year's time if the necessary resources were made available. The result would be an improvement over existing conditions but not a final solution.

Other findings of the master are referred to hereafter.

2. *The duties of assessors.* The findings of the master disclose that illegal assessments have long been the rule rather than the exception throughout much of the Commonwealth. The duty of assessors is to assess property at its "fair cash valuation." G. L. c. 59, § 38. *Bettigole* v. *Assessors of Springfield,* 343 Mass. 223, 230-232 (1961). *Leto* v. *Assessors of Wilmington,* 348 Mass. 144, 146-147 (1964). *Shoppers' World, Inc.* v. *Assessors of Framingham,* 348 Mass. 366, 371-372 (1965). *Assessors of Lynn* v. *Shop-Lease Co. Inc.* 364 Mass. 569, 572 (1974). The assessor's oath of office includes an oath that he "will neither overvalue nor undervalue any property subject to taxation." G. L. c. 41, § 29. Knowing violation for any fraudulent or corrupt purpose is a crime. G. L. c. 41, § 30. He is to subscribe, at the end of a valuation list, "under the penalties of perjury," a statement that each assessment of property is made "at its full and fair cash value, according to our best knowledge and belief." G. L. c. 59, § 52.

We have no doubt that many assessors have taken the oath and subscribed the statutory statement in the belief, or even on the advice of counsel, that it was to be understood in an Aesopian or Pickwickian sense. See *Bennett* v. *Assessors of Whitman,* 354 Mass. 239, 240 (1968). We do not advocate wholesale prosecutions for knowing undervaluation or for perjury. But we do not understand how an assessor who subscribes "under the penalties of perjury" a statement that property has a full and fair cash value of $1,900 can be said to act lawfully or properly, whatever his motive or whatever the·advice he had received, if he knows that the property is worth $10,000.

3. *The powers of the commissioner.* Assessors are not State officers in the ordinary sense of the term, and are not subordinates of the commissioner; "in the performance of their statutory duties the assessors act under the direction of the commissioner only so far as the power of direction is conferred upon him by statute." *Hobart* v. *Commissioner of Corps. & Taxn.* 311 Mass. 341, 344 (1942). He "may" visit

any town, inspect the work of its assessors, and give them such information and "*require* of them such action as will tend to produce uniformity throughout the commonwealth in valuation and assessments" (emphasis supplied). G. L. c. 58, § 1, as amended through St. 1971, c. 895, § 1. We think the quoted words of the statute confer on him full power of direction in accordance with their literal meaning. They are not limited by subsequent provisions in the same section for printed instructions "as a guide," for training programs, for coöperation with other agencies or organizations, for the furnishing of forms, for appearances by him, and for the giving and obtaining of legal opinions. Nor is the power to "require . . . action" limited by the subsequent sections providing for the forwarding of information, the preparation and furnishing of a manual, instruction and supervision, visits and assistance, instructions as to notices and lists, and prescription of forms. §§ 2-5, as amended through St. 1974, c. 740.

In addition, the commissioner "may cause an assessor to be prosecuted . . . for any violation of law relative to assessment of taxes for which a penalty is imposed." G. L. c. 58, § 1. In certain circumstances, "he shall forthwith *direct* said assessors to adopt such methods of keeping their records or to make such examination of the records of the registry of deeds and probate court, or to make such use of the information that he has furnished to them, as he deems necessary" (emphasis supplied). On failure to comply "he shall forthwith notify the mayor or selectmen of said failure, with any recommendations which he deems necessary or expedient." § 4. He may "require" assessors to furnish him with any information in their possession. § 6. He may also "require" them to make reports to him. § 7.

"If assessors . . . fail to perform their duties, the commissioner of corporations and taxation may appoint three or more persons to be assessors for such town, who shall be sworn, shall hold office until the offices of assessors are filled by the town, and shall receive from the town compensation as assessors." G. L. c. 41, § 27, as appearing in St. 1936, c. 118, § 1. For this purpose, "town" includes

"city." G. L. c. 4, § 7, Thirty-fourth. We do not undertake now to decide what constitutes such a failure to perform duties as to bring this statute into operation; but it is our opinion that a statutory power in the commissioner to require action by assessors implies a duty on the part of the assessors to act as required by him. .

The commissioner is "responsible for administering and enforcing all laws which the department [of corporations and taxation] is or shall be required to administer and enforce," and is "the executive and administrative head of the department." G. L. c. 14, § 3, as appearing in St. 1953, c. 654, § 1. As we point out hereafter, the commission is part of the department and is required to administer and enforce the laws relating to equalized valuation. From what we have said we think it is clear that the functions of the commissioner with respect to the duties of local assessors are not merely advisory and educational, but include the powers of direction we have described.

The contrary argument made on behalf of the commissioner seems to us to involve a misreading of the 1964 opinion of the Attorney General. See Rep. A. G., Pub. Doc. No. 12 (1964) 208, 210-211. That opinion recognized the commissioner's power of direction in "certain 'limited' situations," including those we have described. It denied the commissioner power to overrule a decision of local assessors either as to a particular parcel or as to total valuation. Compare G. L. c. 59, § 76, providing that he may "recommend" revision in such cases. But the opinion also stated that, with respect to a case of aggregate valuation at 40% of full and fair cash value, the commissioner has the authority and it is "incumbent" on him, "to direct the assessors to make the necessary adjustment in aggregate valuation." We agree.

4. *The duties of the commission.* On or before April 1 in each even-numbered year the commission is to "determine and establish for each city and town a proposed equalized valuation which shall be the fair cash value of all property in such city or town subject to local taxation as of January first in such year." G. L. c. 58, § 9, as appearing in St. 1966,

c. 14, § 43. It may *"require* from State, city and town officers such returns and statements relative to the amount and value of taxable property in the several cities and towns as it deems necessary" (emphasis supplied). § 10, as appearing in St. 1966, c. 14, § 43. Failure for thirty days to submit such information in its possession as the commission requests in writing deprives the city or town of its right to appeal the decision of the commission. § 10, as amended by St. 1968, c. 256, § 1. Provision is made for notice, public hearing, appeal to the Appellate Tax Board, and final establishment and report to the Legislature on or before December 31. §§ 10A-10C, inserted by St. 1966, c. 14, § 43. "The equalized valuations and apportionments so established shall be the basis for all state, county, or district assessments, distributions, and appropriated grants and reimbursements which are based on equalized valuations and apportionments, in the next two year period and until another equalization and apportionment has been established." § 10C, as amended by St. 1974, c. 492, § 5, effective July 8, 1974.

The master's findings show that the commission has tried to establish equalized valuations at fair cash value, as required by statute, but that it has not been able to achieve acceptable uniformity or equalized valuations within acceptable reach of full and fair cash value. The result is discrimination against those cities and towns whose assessors act lawfully, in favor of those whose assessors engage in the illegal practice of fractional valuation. The findings also show that fractional valuation makes the equalization task much more difficult, if not impossible. Where the ratio of assessment to fair cash value varies widely within a city or town, equalization apparently can succeed only if the commission reappraises each parcel itself, and such reappraisal is now and probably will forever remain beyond the commission's capacity in view of the resources available to it.

The problem needs illustration. The 1974 work sheets for a number of cities and towns are exhibits. They show heavy reliance on the ratios of assessment to sale price for parcels

sold during 1972 and 1973. The ratios for residential property, for example, are plotted on a sheet of graph paper, and the median ratio is selected. The median ratio is then applied to the total assessed valuation of residential property to arrive at an equalized valuation.

The work sheets for Boston, for instance, show a composite assessment/sales ratio of 38%. But the 1973 median ratios for sales of residential property in different districts in the city ranged from 16% for Charlestown to 40% for Roxbury, with a composite residential ratio of 27.8%. Thus from data including the facts that the median sale in Charlestown brought about six times the assessed value and the median sale in Roxbury brought about two and one-half times the assessed value, computation produces the conclusion that residential assessed values throughout the city should be equalized at a little less than four times assessed value. The process has lost contact with reality. If, as often happens, property with a low rate of turnover is assessed lower than property with a high rate of turnover, the result is a serious understatement of equalized value.

It seems to us that it follows that the commission may deem necessary accurate statements of fair cash value and hence may "require" such statements from city and town officers. To the extent that such statements are necessary to equalized valuation at fair cash value, we think it is the duty of the commission to require them.

5. *Injunctive relief.* The question remains whether any relief can be granted to the plaintiffs in this suit. When taxpayers sought citywide equalization, we noted that the remedy involved "problems of great practical complexity, usually solved by executive action or pursuant to express legislative directions." *Carr* v. *Assessors of Springfield,* 339 Mass. 89, 93, fn. 2 (1959). We have not granted injunctive relief in such cases: "(1) unless basic facts exist showing essentially a deliberate and substantial violation of the constitutional and statutory requirements that property tax valuations shall be proportional; (2) unless the plaintiffs show themselves to be directly, significantly and adversely affected; (3) unless relief by ordinary abatement

procedures or by an action at law will be seriously inadequate; and (4) unless equitable relief is shown to be practicable and appropriate in the sense that the assessors' constitutional and statutory violations are so great as to warrant seasonable equitable interference with normal tax assessment and collection processes." *Leto* v. *Assessors of Wilmington,* 348 Mass. 144, 148-149 (1964). Cf. *Coan* v. *Assessors of Beverly,* 349 Mass. 575, 577-578 (1965); *Bennett* v. *Assessors of Whitman,* 354 Mass. 239, 241-242 (1968); *Nearis* v. *Gloucester,* 357 Mass. 203, 205 (1970).

The defendants here contend that none of these prerequisites is satisfied. The present case, involving discrimination between one group of cities and towns and another, is obviously somewhat different from a case involving discrimination within a city or town. We do not address the questions whether the present suit is subject to the same prerequisites and whether they are met. We think injunctive relief should be reserved for the time being, for a different reason. The master has found, in effect, that the commissioner and the commission stand ready to do their duties if they are told what they are, and what their powers are to carry out their duties. Cf. *Bettigole* v. *Assessors of Springfield,* 343 Mass. 223, 237-238 (1961). This we have done. In this situation we think continuing judicial supervision of their executive functions is not appropriate. Cf. *Leto* v. *Assessors of Wilmington, supra,* at 151. We therefore do not pass on the plaintiffs' claim that relief is authorized by the Civil Rights Act, 42 U. S. C. § 1983 (1970). Compare *Levy* v. *Parker,* 346 F. Supp. 897, 901 (E. D. La. 1972), affd. 411 U. S. 978 (1973), with *Ad Hoc Comm. on Judicial Admn.* v. *Massachusetts,* 488 F. 2d 1241, 1244-1246 (1st Cir. 1973).

6. *Declaratory relief.* No such obstacle stands in the way of declaratory relief. It is clear that an actual controversy has arisen between the plaintiffs and the defendants as to the powers and duties of the defendants with respect to the taxation of property at its full and fair cash value. G. L. c. 231A, §§ 1, 2. The plaintiffs have shown a probable loss of revenue sufficient to give them a substan-

tial economic interest in that controversy. See *Massachusetts Assn. of Tobacco Distribs.* v. *State Tax Commn.* 354 Mass. 85, 89 (1968). A declaratory decree will resolve the particular controversy. G. L. c. 231A, § 3. The opposing positions are adequately represented, and we need not have before the court every person or group who conceivably might ultimately be affected by the outcome of the case. *Trustees of Tufts College* v. *Volpe Constr. Co. Inc.* 358 Mass. 331, 340 (1970). In view of the finding that the defendants would act if so directed "and if given the necessary resources," however, we think the case should be retained in the county court to permit reports of progress to be made to a single justice of this court.

7. *Disposition.* The case is remanded to the county court. An interlocutory decree is to be entered declaring that (1) the commissioner has the power and the duty to direct local assessors to take such action as will tend to produce uniformity throughout the Commonwealth in valuation and assessments; (2) the commission has the power and the duty to direct city and town officers to furnish such returns and statements relative to the amount and value of taxable property in the city or town as it deems necessary to enable it to determine and establish for each city and town an equalized valuation which shall be the fair cash value of all property in such city or town subject to local taxation as of January 1 in each even-numbered year; and (3) the functions of the commissioner and the commission in these respects are to command and not merely to advise or educate, and it is the legal duty of the assessors to obey their lawful commands. The decree is further to provide that jurisdiction of the case is retained pending further order of a single justice, that the commissioner and the commission are to make a report of progress to the single justice within six months after the entry of the interlocutory decree, and that the single justice will thereafter make such interlocutory or final decree as is appropriate.

*So ordered.*