Salinger, Kenneth W., J.
The publisher of The Boston Globe seeks a declaration that the Massachusetts public records law now applies to the Retirement Board of the Massachusetts Bay Transportation Authority Retirement Fund. The Globe also seeks an injunction ordering the Retirement Board to produce minutes of meetings concerning the Fund’s $25 million investment in a hedge fund that lost all its value and sought bankruptcy protection amid allegations of fraud. The Board says it is not subject to the public records law and refuses to give these records to the Globe.
The central issue is whether the Fund “receives public funds” and thus is subject to the public records law as amended in 2013. Both sides have moved for summary judgment. The parties agreed to reserve any claims by the Board that the relief sought would be unconstitutional. But the Board argues that its constitutional claims help show that the amended statute does not apply to it or the Fund.
The Court will ALLOW the Globe’s motion for summary judgment and DENY the Retirement Board’s cross motion. The Retirement Board’s preliminary assertions that the Supreme Judicial Court has already resolved the central question of statutory interpretation in the Board’s favor, and that in any case the Globe may not press its claims because it failed to join other necessary parties, are both incorrect. On the merits, the Court concludes that the Board does indeed receive public funds from the MBTA, and thus that the Board’s records are now subject to mandatory disclosure under the public records law unless they fall within one of the statutory exemptions. The Board’s assertion that the 2013 statutory amendment only applies to records created after its effective date is also incorrect.
The Court will schedule a status conference to learn whether any further constitutional issues, or any claim by the Board that documents requested by the Globe are exempt from disclosure, must be decided to resolve this case. If so, it will set a schedule for addressing the remaining issues.
1. Background
The parties have stipulated to various facts for the purposes of the pending motions for summary judgment. Those stipulations, reasonable inferences that can be drawn from those facts, and other relevant legal background can be summarized as follows.
1.1. Legal and Procedural Background
By law, “[e]very person having custody of any public record” must, “without unreasonable delay,” allow the record “to be inspected and examined by any person and provide ’’one copy thereof upon payment of a reasonable fee." G.L.c. 66, §10(a). Up until 2013, the public records law applied only to state and local government agencies, authorities, and political subdivisions of the Commonwealth. That is because the Legislature had defined “public records” to mean any documents or data “made or received by any officer or *376 employee of any agency, executive office, department, board, commission, bureau, division or authority of the commonwealth, or of any political subdivision thereof, or of any authority established by the general court to serve a public purpose,” unless the materials or data fall within a specific statutory exemption. G.L.c. 4, §7, clause twenty-sixth. An entity that falls within this definition is referred in the public records law as a “custodian” of the public records in its custody. G.L.c. 66, §10(b) & (c). By law there is a presumption that any record held by such a custodian “is public, and the burden shall be upon the custodian to prove with specificity the exemption which applies.” Id. § 10(c). The MBTA is subject to the public records law because it is a “political subdivision of the commonwealth.” See G.L.c. 161A, §2.
The Supreme Judicial Court held in 1993 that the public records law did not apply to the MBTA Retirement Board, because the Board did not fall within any of the categories of public entities described in the statutory definition of “public records.” See Globe Newspaper Co. v. Massachusetts Transp. Auth. Ret. Bd., 416 Mass. 1007 (1993) (rescript) {“Board IT). The SJC issued a short “rescript” decision in that case, incorporating by reference the reasoning of its prior ruling that the Board was not a “State agency” within the meaning of, and thus its employees were not subject to, the conflict of interest law. See Massachusetts Bay Transp. Auth. Ret. Bd. v. State Ethics Common, 414 Mass. 582 (1993) {“Board T).
In July 2013, the Legislature amended the statutory definition that determines the scope of the public records law, through an outside section of the state’s FY 2014 operating budget. It left intact the language quoted above. But it added language stating that “public records” shall also mean any documents or data made or received by “any person, corporation, association, partnership or other legal entity which receives or expends public Jiinds for the payment or administration of pensions for any current or former employees of the commonwealth or any political subdivision thereof as defined by section 1 of chapter 32 of the general laws” (emphasis added). See St. 2013, c. 38, §4 (amending G.L.c. 4, §7, clause twenty-sixth). “Political subdivision” is defined in G.L.c. 32, §1, to include the MBTA. When the Legislature broadened the scope of the public records law in this way, it did not revise the statutory exemptions from the obligation to produce public records. A year later, the Legislature repealed this amendment through an outside section of the FY 2015 general appropriations act. See St. 2014, c. 165, §198. Governor Patrick vetoed that section, however. As a result the 2013 amendment to the statutory definition of “public records” remains in effect.
In December 2013, reporter Beth Healy of the Globe asked the Retirement Board to provide copies of meeting minutes concerning an investment by the Fund in the Fletcher Fixed Income Alpha Fund.[1] In response, the Board told Healy that “there is considerable doubt as to the applicability and validity of the recent amendment to G.L.c. 4, §7, cl. 26.” It sent Healy a copy of a prior letter to the Boston Herald that explained the Board’s legal position in more detail. The Board has not provided any of the records requested by Healy.
The Globe then asked Supervisor of Public Records Shawn Williams, at the Secretary of the Commonwealth’s Public Records Division, to order the Retirement Board to provide the records requested by Ms. Healy. The Supervisor denied that request. Mr. Williams concluded that the Supreme Judicial Court had decided in Board I that the Retirement Board does not receive or expend public funds, and that as a result the broadened definition of “public records” adopted in 2013 does not apply to the Board or to the Fund.
The Board represents that, because the Supervisor ruled that the public records law does not apply to the Board or the Fund, the Board has made no attempt to collect any of the meeting minutes sought by the Globe or to determine whether any part of those records may be exempt from disclosure.
The Globe brought this action against the Retirement Board in April 2014. It filed the action with the Supreme Judicial Court for Suffolk County. Cf. G.L.c. 66, §10(b) (an action seeking public records may be filed with the SJC or in the Superior Court). A single Justice of the SJC (Botsford, J.) transferred the case to Suffolk Superior Court. Cf. G.L.c. 211, §4A (authorizing any SJC justice to transfer to “any appropriate lower court any cause or matter which might otherwise be disposed of by a single justice”). The Globe filed an amended complaint in August 2014. The amended complaint defines the scope of relief now sought by the Globe. The parties filed their cross-motions for summary judgment in December 2015.
1.2. Additional Factual Background
The MBTA was created in 1964. It is a “political subdivision of the commonwealth” and is charged with the “duty to develop, finance and operate mass transportation facilities and equipment in the public interest.” G.L.c. 161A, §§2 & 5(a). The MBTA was the successor to the Metropolitan Transit Authority (“MTA”), which operated the public transportation system in the Boston area from 1947 to 1964. The MTA was created to take over that system from the Boston Elevated Railway Company (“Boston Elevated”). Workers employed by Boston Elevated were represented by a bargaining unit known as the Amalgamated Association of Street, Electric Railway and Motor Coach Employees of America, Division 589. Today this same bargaining unit is known as Local Union 589, Amalgamated Transit Union, AFL-CIO, CLC.
Members of Local 589 who are or were employed by the Boston transit system have long been the beneficiaries of private pensions established by contract. Boston Elevated employees participated in a non-con- *377 tributoiy pension plan starting in 1920, and in a contributory retirement plan beginning July 1, 1941. The statute establishing the MTA provided that the MTA’s employees would not be subject to the general public employee retirement law, and instead authorized the MTA to continue to pay pensions and retirement allowances pursuant to the plans that had been created by Boston Elevated. See St. 1947, c. 544, §18. Shortly after it came into existence, the MTA negotiated a contract with Local 589 establishing a new contributory retirement plan, which replaced the prior plans established by Boston Elevated. This new plan took effect January 1, 1948. The more recent statute establishing the MBTA similarly provided that the MBTA’s employees would not be subject to the general public employee retirement law, and instead required the MBTA to continue to employ the pension plan established by the MTA. St. 1964, c. 563, §§19 & 22. The MBTA and Local 589 negotiated a new pension agreement in 1970. That contract has been amended from time to time.
From 1948 to 1980, the assets of the Fund were held and managed first by the Old Colony Trust Company and then by its successor, the First National Bank of Boston. In 1980, with the agreement of the MBTA and Local 589, the Retirement Board became responsible for administering the retirement plan established by contract between the MBTA and Local 589 and for managing the Fund’s assets that pay the plan’s costs.
All costs of Local 589’s retirement plan and of the Retirement Board are paid by the Fund. The Board and the Fund are private, non-public, legal entities. All assets of the Fund are beneficially owned by its members, retired members, and their beneficiaries. Neither the MBTA nor the Commonwealth guaranties the Fund’s pension obligations or has any legal interest in the Fund or its assets.
The Fund has three sources of revenue: payments or “contributions” made by the MBTA, contributions made by MBTA employees who are members of Local 589, and investment returns that the Fund earns from its accumulated assets. The MBTA’s payments are the largest of these three revenue streams. In 2013, for example, the MBTA paid the Fund $58.0 million, MBTA employees paid $21.0 million, and the Fund had investment returns of $32.3 million. From 2009 to 2013 the MBTA contributed atotal of $252.9 million to the Fund, employees’ contributions totaled $93.4 million, and the Fund’s investment returns totaled $164.6 million.
The amount of the contributions or payments made to the Fund are set by contract after negotiation by the MBTA and Local 589. The MBTA currently pays the Fund an amount equal to 15.1511% of annual pre-tax compensation for Local 589 members who participate in the pension plan, and the members pay an additional 5.4989% of their annual pre-tax compensation. Each month, the MBTA calculates each employee’s contribution to the Fund, which is deducted from the employee’s gross pay, as well as the MBTA’s own contribution. The MBTA then instructs its bank to transfer those amounts electronically from the MBTA’s account to the Fund’s bank account. The parties have stipulated that the MBTA’s contributions are irrevocable upon transfer to the Fund’s bank.
The MBTA pays these contributions from general revenues. For FY 2015, the MBTA anticipated receiving almost $2.0 billion in operating revenues, mostly from tax revenues paid to the MBTA by the Commonwealth of Massachusetts, fares collected from riders, and assessments on cities and towns served by the MBTA. Roughly 57 percent of the MBTA’s total revenues that year were expected to come from State funding, in large part from a dedicated portion of the state sales tax.
2. Preliminary Issues
The Retirement Board argues that the Court should not consider the merits of the Globe’s claims. It asserts that the SJC determined in 1993 that the Retirement Board is not subject to the public records law because it does not receive public funds and that, since the Globe was a party to that prior case, the Globe is barred from relitigating the issue under the doctrine of issue preclusion or collateral estoppel. The Board also asserts that the Globe failed to join necessary parties whose interests may be affected by any declaratory judgment entered in this case. Neither of these claims has merit.
2.1. Issue Preclusion
The Supreme Judicial Court’s decision in the Board II case, holding that the Retirement Board was not subject to the public records law in effect at that time, did not resolve the issues raised by the Globe in this case. The Board misconstrues the SJC’s prior rulings. In addition, the 2013 statutory amendment makes the doctrine of issue preclusion inapplicable here.
2.1.1. Nature of Prior SJC Holdings
The Retirement Board’s assertion that the Supreme Judicial Court conclusively held in Board II that the Retirement Board does not receive public funds is incorrect. To understand why, one must first understand the SJC’s prior decision in Board I.
The issue in the Board I case was whether Retirement Board members and employees were subject to the State conflict of interest law. See Board I, 414 Mass, at 582. The Ethics Commission had ruled that the Board was a “state agency” as defined in G.L.c. 268A and that, as a result, its members and employees were subject to this statute. The Commission applied a four-part test of its own devising to determine whether the Board was a “state agency.” On appeal, the SJC used the Commission’s four-factor test as a starting point, even though it was not mandated by statute. The SJC concluded that three of the factors— *378 the means by which the Board was created, whether the Board performs an essential governmental function, and the extent to which the government controls or supervises the board—all weighed against treating the Board as a state agency or instrumentality.
The fourth factor applied by the Ethics Commission, but rejected by the SJC, was “whether the board receives or expends public funds.” Board I, 414 Mass. at 587. The SJC held that this factor was overbroad. It criticized the Commission for “focus[ing] on the pension plan’s receipt of substantial funding each year from the MBTA, a public body, and the continuing interest of taxpayers and the government in the use of public funds.” Id. at 590. The SJC observed that the MBTA paid “private health care providers” or insurers tens of millions of dollars per year to cover its employees, but said “that it would be absurd to suggest that that these entities are [therefore] public instrumental-ities.” Id. at 591. The SJC’s evident concern was that, under this part of the Commission’s test, every private health care provider or insurer, human services agency, construction contractor, snow plow driver, plumbing business, law firm, and other entity that is hired to provide services to the Commonwealth or its public authorities would be treated as a state agency subject to the conflict of interest law.
The SJC therefore held that “[t]he analysis of this factor . . . should focus on the use of the public funds received by the entity in question.” Board I, 414 Mass, at 591. In other words, the SJC held that whether the Retirement Board received public funds from the MBTA had no bearing on whether it was a state agency within the meaning of the conflict of interest law. Instead, what mattered was whether its spending was public in nature. The SJC held that the Board did not expend public funds. It concluded that “the public funds contributed by the MBTA, like wages, become private in nature once they are paid.” Id. In sum, even though the SJC agreed with the Commission that the Retirement Board received public funds, it held that was irrelevant because those same funds, “[o]nce transferred out of the MBTA’s custody” and received by the Board were irrevocably devoted to the private purposes of the Fund and thus became private monies, just like all other compensation paid to or on behalf of the MBTA’s employees. Id.
The Board II case, raising the issue of whether the Retirement Board was subject to the public records law, came before the Supreme Judicial Court a few months after the SJC had decided Board I. The Globe argued that the Retirement Board was a “board” of the MBTA and that its records therefore fell within the statutory definition of “public records.” The SJC disagreed. It held that this case was governed by the Board I decision, that the same factors applied by the SJC in that case applied here, and that the Retirement Board was not a “board” of the MBTA for the same reasons it was not a “state agency.” See Board II, 416 Mass. at 1007. The SJC issued a short, four-paragraph decision that summarized and referred to its ruling in the prior case. Id. It reiterated “that the funds which the board receives from the MBTA, like wages, become private once they are transferred out of the MBTA’s custody.” Id., citing Board I, supra, at 590. In other words, the SJC reiterated its prior conclusion that the Board did not expend public funds. This was not a finding that the Board receives no public funds since, as the SJC made clear in Board I, receipt of public funds was not sufficient to make the Board a state agency or board within the meaning of these statutes as then written.
In sum, the Retirement Board’s assertion that the Board II decision conclusively establishes that the Board receives no public funds is without merit. The SJC’s prior rulings in Board I and Board II establish that the Board’s spending does not constitute the expenditure of public funds, but do not hold that the Board receives no public funds from the MBTA.
2.1.2. Intervening Statutoiy Change
There is a second reason why the doctrine of issue preclusion does not block the Globe’s claims: the legal question decided by the SJC in 1993 is materially different from the issue raised in this action. In the prior case, the SJC had to determine whether the Retirement Board is a public entity—and, more specifically, whether it “is a board of the Massachusetts Bay Transportation Authority”—within the meaning of the statutoiy definition of “public records.” See Board II, 416 Mass, at 1007. In 2013, twenty years later, the Legislature amended the statutoiy definition of “public records.” As a result, the key question in this case is whether the Board “receives” public funds that it uses to pay or administer pensions for former MBTA employees. See G.L.c. 4, §7, cl. twenty-sixth, as amended by St. 2013, c. 38, §4.
There is a strong public interest in whether the amended statute applies to the Retirement Board. Most of the Fund’s revenue comes from the MBTA and is paid out of public funds. The public records law reflects the Legislature’s judgment that it is in the public interest to compel access to records regarding the distribution or payment of public funds. Cf. Hastings & Sons Pub. Co. v. City Treasurer of Lynn, 374 Mass. 812 (1978) (public records law requires disclosure of disbursements to police officers for off-duty work details, because public interest in disclosure of government spending outweighed officers’ privacy interests) .
Given the statutoiy change and the public interest in what it means, it would not be appropriate to bar the Globe’s claims on the ground that the SJC previously considered a similar but not identical issue. See generally Alicea v. Commonwealth, 466 Mass. 228, 236 (2013) (issue preclusion only applies where same issue was actually litigated, decided, and essential to judgment in prior action). Issue preclusion is an equi *379 table doctrine, and “equitable considerations may permit less stringent application of the normal rules of issue preclusion.” Mercurio v. Smith, 24 Mass.App.Ct. 329, 332 (1987). One “discretionary exception . . . permits a reviewing court to authorize re-litigation of an issue because of an intervening change in the applicable law.” Commonwealth v. Williams, 431 Mass. 71, 76 (2000), citing Restatement (Second) of Judgments, §28(2) (1982). Another discretionary exception may apply where “[t]here is a clear and convincing need for a new determination of the issue” either “because of the potential adverse impact of the determination on the public interest or the interests of persons not themselves parties in the initial action” or “because it was not sufficiently foreseeable at the time of the initial action that the issue would arise in the context of a subsequent action.” York Ford, Inc. v. Building Inspector and Zoning Adm’r of Saugus, 38 Mass.App.Ct. 938, 842 n.10 (1995), quoting Restatement (Second) of Judgments, §28(5) (1982); accord Mercurio, supra, at 332 n.5. All of these considerations apply here, and weigh heavily against dismissing the Globe’s claims under the equitable doctrine of issue preclusion.
2.2. Joinder of Other Parties
The Retirement Board’s alternative argument that the Globe may not seek declaratory relief because it did not join all necessary parties is also without merit. The Board asserts there are “other private entities that, like the Fund, have entered [into] contracts with public entities to receive monies . . . for purposes of administering employee retirement plans.” In particular, the Board suggests that retirement plans established by the Massachusetts Technology Park Collaborative (“MassTech”), the Community Economic Development Assistance Corporation (“CEDAC”), and the Massachusetts Life Sciences Center (“MLSC”) may be indistinguishable from the pension plans administered by the Board, and thus would necessarily be subject to the public records law if the Globe were to prevail in this case. The Board contends that “[t]he Globe’s failure to join these entities requires dismissal” under the declaratory judgment statute, G.L.c. 231 A, §8. That is incorrect for several reasons.
First, the Retirement Board misconstrues G.L.c. 231A, §8. That section states that “[w]hen declaratory relief is sought, all persons shall be made parties who have or claim any interest which would be affected by the declaration, and no declaration shall prejudice the rights of persons not parties to the proceeding.” This provision only requires the joinder of other parties who have an independent “legal interest” that must be decided in order to adjudicate the claim for declaratory relief. Harrison v. Massachusetts Society of Professors/Faculty Staff Union/MTA/NEA, 405 Mass. 56, 60 (1989); accord, Service Employees Int’l Union, Local 509 v. Department of Mental Health, 469 Mass. 323, 338 (2014) (claim for declaratory relief regarding validity of contracts between DMH and vendors could not be adjudicated unless vendors are joined as parties). But the Globe does not seek to adjudicate any legal interests or obligations of entities other than the Retirement Board and the Fund. No decision in this case will bind any other entity. The mere possibility that a final appellate decision in this case could serve as legal precedent that affects other entities does not mean that those entities must be made parties to this action. See Attorney General v. Kenco Optics, Inc., 369 Mass. 412, 415 (1976) (“G.L.c. 231A, §8, does not require the joinder of persons who would be affected by a decision only as a precedent on an issue of law”); Massachusetts Ass’n of Tobacco Distributors v. State Tax Comm’n, 354 Mass. 85, 88 (1968) (§8 does not require that “everyone with interests identical to those already parties be joined”). “(W]e need not have before the court every person or group who conceivably might ultimately be affected by the outcome of the case.” Town of Brookline v. County Comm’rs of the County of Norfolk, 367 Mass. 345, 349 (1975), quoting Town of Sudbury v. Comm'r of Corps & Taxn., 366 Mass. 558, 569 (1974).
Second, the stipulated facts suggest that the retirement plans offered to the employees of MassTech, CEDAC, and MSLC are not “pensions” within the meaning of the amended public records law. That amendment expanded the definition of public records to include any entity that “receives or expends public funds for the payment or administration of pensions,” as that term is defined by chapter 32 of the general laws. See G.L.c. 4, §7, cl. twenty-sixth. A “pension” is defined by statute to mean payments dependent upon the continuance of life of any member or beneficiary and derived from contributions made by the appropriate governmental unit." G.L.c. 32, §1. In other words, the “pensions” referred to in the 2013 statutory amendment are what have come to be known as “defined benefit plans,” under which individual employees are guaranteed specific benefits upon retirement that are funded at least in part by a government entity. Such pension plans are very different from a “defined contribution plan,” in which the employer, the employee, or both of them contribute specified amounts to separate retirement accounts owned by each individual employee, and neither the employer nor anyone else guarantees the employee’s investment returns or the income that the employee will be able to withdraw from the account after retiring. Cf. Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 439-40 (1999) (distinguishing defined benefit and defined contribution plans). The retirement plans offered by MassTech, CEDAC, and MSLC appear to be defined contribution plans or functionally equivalent individual retirement accounts offered under §§401(k), 403(b), 408(k), or 457 of the Internal Revenue Code.[2] Since these plans do not appear to be “pensions” as that term is used in the public records law, the Board’s joinder argument *380 would be without merit even if the Board had not misread the declaratoiy judgment act.
It is unsurprising that the Legislature decided to broaden the public records law to apply to administrators or providers of defined benefit pension plans that receive public funds, but not to administrators of individual retirement accounts or other defined contribution plans. Under a defined benefit pension plan, “the possibility exists that at a given time plan assets will fall short of the present value of vested plan benefits,” and thus that additional funding will be needed to pay for guaranteed retirement benefits. See Connolly v. Pension Ben. Guar. Corp., 475 U.S. 211, 230 (1986) (O’Connor, J., concurring). In contrast, with a defined contribution plan “ ‘there can never be an insufficiency of funds in the plan to cover promised benefits,’ . . . since each beneficiary is entitled [only] to whatever assets are dedicated to his individual account.” Hughes Aircraft, 525 U.S. at 439, quoting Nachman Corp. v. Pension Ben. Guar. Corp., 446 U.S. 359, 364 n.5 (1980). The Legislature could reasonably conclude that there is a strong public interest in obtaining information about Local 589’s retirement plan, or about any similar private defined benefit pension plan financed largely with public funds, because any funding shortfall could lead to pressure to increase the public funding of the plan even if there is no contractual obligation to do so.
3. Construing the Statute 3.1. Plain Meaning of the Statutory Amendment
With all those preliminaries out of the way, the merits of this case are simple by comparison. The Fund receives public funds from apolitical subdivision of the Commonwealth for paying and administering “pensions” as that term is defined by statute. The Fund and the Retirement Board therefore fall within the scope of the 2013 amendment to the public records law. The only part of this analysis contested by the Retirement Board is whether the Fund receives public funds.
Each year the MBTA contributes tens of millions of dollars to the Fund to be used to pay and administer pensions for MBTA employees. These sums are public funds that come from taxes collected by the Commonwealth, fares collected by the MBTA, and assessments on certain cities and towns.
As a result, the Board and the Fund receive public funds from the MBTA within the meaning of the 2013 amendment to the public records law. Once the funds have been received, and the MBTA no longer has any legal claim upon them, these monies are no longer public. See Board I, 414 Mass. at 591; Board II, 416 Mass. at 1007. But the funding provided to the Fund by the MBTA is public when paid by the MBTA and thus is public when received by the Fund. Courts should “give effect to a statute’s ‘plain and ordinary meaning’ where the statute’s words are clear.” Olm-stead v. Department of Telecommunications and Cable, 466 Mass. 582, 588 (2013), quoting Massachusetts Broken Stone Co. v. Town of Weston, 430 Mass. 637, 640 (2000); see generally Commonwealth v. Hanson H., 464 Mass. 807, 810 (2013) (statute must be construed in accord with ordinary meaning of its words, considered in context of statute as a whole, to produce meaning that best reflects its apparent purpose). Using the plain and ordinary meaning of the words in the 2013 statutory amendment, the reference to any legal entity that “receives public funds” encompasses a private entity like the Fund that is paid money by a governmental entity like the MBTA from tax revenue and other sources of public funds.
The Retirement Board tries to draw a metaphysical distinction between the instant in time when money is electronically transferred out of the MBTA’s bank account and the fraction of a second later when those same funds are credited to the Fund’s bank account. The Board insists that even though these monies are public funds when they are paid out by the MBTA, they are no longer public funds one blink of the eye later when they are received by the Fund.
This makes no sense. It cannot be squared with the plain language of the statutory amendment adopted by the Legislature, which makes no distinction between the payment or transfer of public funds and their receipt by an entity like the Fund. Nor can it be squared with the background legal rules that govern electronic funds transfers. The Retirement Board’s notion that the MBTA relinquishes any claim on monies transferred from its account the moment the electronic transfer order is executed by the MBTA’s bank is incorrect as a matter of law. If the MBTA accidently transferred too much money to the Fund, either by erroneously instructing payment of too high an amount or erroneously transmitting duplicate payment orders, by law the MBTA would not be required to make payment on the transfer order and the MBTA’s bank would be entitled to recover the mistaken overpayment from the Fund. See G.L.c. 106, §4A-205. Much the same would be true if the MBTA intended to make a payment to the Fund but inadvertently placed a transfer order directed to some other account. Id. Thus, the MBTA does not irrevocably relinquish any claim to funds the instant they are electronically transferred out of its bank account. It follows that the monies paid by the MBTA to the Fund do not lose their character as public funds until after they are irrevocably credited to the Fund’s account.
3.2. Application to Prior Records
The 2013 amendment to the definition of “public records” applies to all records made or received by the Retirement Board or the Fund, whether before or after that amendment took effect. This reading of the statute follows from the nature and purpose of the public records law, which is to provide public access to all *381 non-exempt records made or received by any entity that is subject to the public records law.
The Retirement Board insists that construing the revised statute as applying to pre-existing records would give the amendment impermissible retroactive effect. It argues that statutory amendments are presumed to have only prospective effect, and that amendments to the public records law must therefore be construed not to apply to records created before the amendment took effect.
Reading the statute in the manner advocated by the Retirement Board would produce perverse results. For example, not long after the horrific terror attacks on September 11, 2001, the Legislature amended the public records law to exempt documents relating to the security of people, buildings, or facilities the disclosure of which “is likely to jeopardize public safely.” See G.L.c. 4, §7, cl. twenty-sixth, 91(n), as added by St. 2002, c. 313, §1. It would be absurd to read this amendment as only applying to documents created after this amendment was enacted in 2002. It is much more sensible to read the public records law and its exemptions as applying to all documents made or received by covered entities, whether the records were created before or after a relevant statutory amendment. Compare Cook v. Patient Edu., LLC, 465 Mass. 548, 556 (2013) (rules of statutory construction do “not mean that an available and sensible interpretation is to be rejected in favor of a fanciful or perverse one” (quoting Commonwealth v. Roucoulet, 413 Mass. 647, 652 (1992)); City of Worcester v. College HOI Properties, LLC, 465 Mass. 134, 145 (2013) (statutes “should not be so interpreted as to cause absurd or unreasonable results when the language is susceptible of a sensible meaning” (quoting North Shore Realty Trust v. Commonwealth, 434 Mass. 109, 112 (2001)).
Furthermore, applying the 2013 statutory amendment to all documents made or received by the Retirement Board, including those created before July 2013, would not constitute retroactive application of the law. “A statute does not operate ‘retrospectively’ merely because it is applied in a case arising from conduct antedating the statute’s enactment, ... or upsets expectations based in prior law.” Moe v. Sex Offender Registry Bd., 467 Mass. 598, 607 (2014), quoting Federal Nat’l Mtge. Ass’n v. Nunez, 460 Mass. 511, 522 (2011), and Landgraf v. USI Film Products, 511 U.S. 244, 269-70 (1994). Instead, “a statute is retroactive in effect where ‘the new provision attaches new legal consequences to events completed before its enactment.’ ” Moe, quoting Landgraf The Supreme Judicial Court has “adopted the Supreme Court’s ‘new legal consequences’ test in deciding whether Massachusetts statutes operate retroactively.” Id.
Under this test, “[w]hen the intervening statute authorizes the propriety of prospective relief, application of the new provision is not retroactive.” Landgraf, 511 U.S. at 273. This principle applies to statutory amendments to the scope of public records or equivalent freedom of information acts. See Center for Biological Diversity v. United States Dept. of Agriculture, 626 F.3d 1113, 1118 (9th Cir. 2010); City of Chicago v. U.S. Dep’t of Treasury, Bureau of Alcohol, Tobacco & Firearms, 423 F.3d 777, 783 (7th Cir. 2005).
When a party like the Globe files suit seeking to enforce such a statute, they are “seek[ing] the prospective relief of an injunction directing” the defendant “to provide it with certain information” or records. Center for Biological Diversity, supra accord Chicago, supra. “[T]he relevant event for assessing retroactivity here is the disclosure of the withheld data, which is a potential future event, not a past, completed event.” Chicago, supra. As a result, a statutory amendment changing the scope of a public records law or freedom of information act “merely affects the propriety of this prospective relief and is therefore not impermissibly retroactive,” even though it has the effect of increasing or restricting access to pre-existing documents or information. Center for Biological Diversity, supra (new statute barring Department from disclosing geospatial information about agricultural land or operations applied to pending FOIA lawsuit); accord Chicago, supra (new statute restricting access to ATF databases regarding sale and tracing of firearms applied to pending FOIA lawsuit).
3.3. Absence of Serious Constitutional Questions
The Retirement Board’s further argument that the 2013 amendment to the public records law should be construed as not applying to the Board in order “to avoid constitutional difficulty” is also unavailing. The Board invokes the principle that a court has a “duty to construe statutes so as to avoid . . . constitutional difficulties, if reasonable principles of interpretation permit it.” Commonwealth v. Disler, 451 Mass. 216, 228 (2008), quoting School Comm. of Greenfield v. Greenfield Educ. Ass’n, 385 Mass. 70, 79 (1982). “[W]hen ‘a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter.’ ” Gonzalez v. United States, 553 U.S. 242, 251 (2008), quoting Harris v. United States, 536 U.S. 545, 555 (2002), quoting in turn United States ex rel. Attorney General v. Delaware & Hudson Co., 213 U.S. 366, 408 (1909). This principle “is a tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that Congress [or the state legislature] did not intend the alternative which raises serious constitutional doubts.” Clark v. Martinez, 543 U.S. 371, 381-82 (2005); accord Baird v. Attorney General, 371 Mass. 741, 745 (1977).
This “canon of constitutional avoidance” rule of statutory construction does not apply here. Cf. Warger v. Shauers, 135 S.Ct. 521, 529 (2014). As discussed above, the meaning of the 2013 public records law *382 amendment is clear, and it plainly applies to the MBTA Retirement Board. The principle invoked by the Board “has no application in the absence of statutoiy ambiguity.” Department ofHous. & Urban Dev. v. Rucker, 535 U.S. 125, 134 (2002), quoting United States v. Oakland Cannabis Buyers’ Cooperative, 532 U.S. 483, 494 (2001); accord Commonwealth v. Crosscup, 369 Mass. 228, 231 (1975); accord Warger, supra. A judge may not interpret a “statute in a way that is plainly contrary its language” in an attempt to avoid constitutional difficulties purportedly raised by the statute as written by the Legislature. Commonwealth v. Lucas, 472 Mass. 387, 402 n.13 (2015).
Even if the statutoiy amendment were ambiguous, the Retirement Board has not demonstrated that there is any serious reason to believe that applying the public records law to the Board would be unconstitutional. “The canon . . . does not apply unless there are ‘serious concerns about the statute’s constitutionality.’ ” Gonzalez, 553 U.S. at 251, quoting Harris, 536 U.S. at 555; accord Blixt v. Blixt, 437 Mass. 649, 674 (2002); Beeler v. Downey, 387 Mass. 609, 613-14 & n.4 (1982). As the United States Supreme Court has observed, “(t]he ‘constitutional doubts’ argument has been the last refuge of many an interpretive lost cause. Statutes should be interpreted to avoid serious constitutional doubts, not to eliminate all possible contentions that the statute might be unconstitutional.” Reno v. Flores, 507 U.S. 292, 314 n.9 (1993) (emphasis in original, citation omitted). “(T]he ‘constitutional doubt’ doctrine does not apply mechanically whenever there arises a significant constitutional question the answer to which is not obvious.” Almendarez-Torres v. United States, 523 U.S. 224, 239 (1998). To the contrary, it only applies where there is reason “gravely to doubt that the statute is unconstitutional” if construed in a particular manner. Id.
For the reasons discussed below, none of the Retirement Board’s arguments raises any serious question about whether it would be unconstitutional to apply the public records law to the Board and the Fund as a general matter, or to require the Board to produce the meeting minutes requested by the Globe.
3.3.1. Equal Protection
The Retirement Board insists that it would be irrational, and thus violate constitutional principles of equal protection, for the Legislature to apply the public records law to the Board and the Fund without also applying all existing statutoiy exemptions to them. The Board asserts that certain exemptions apply to the Pension Reserves Investment Management (“PRIM”) Board but not to the Board or the Fund. This argument raises no serious constitutional question about the validity of the 2013 amendment.
With respect to trade secrets and similar information, the premise of this argument is incorrect. It is true that, as the Board notes, proprietary information provided to the PRIM Board by investment advisors is protected under the PRIM Board’s statute, which bars disclosure of documents or data containing “trade secrets or commercial or financial information” relating to the PRIM Board’s investments. See G.L.c. 32, §23(6). But the public records law contains an express exemption mirroring this provision. By statute, the Board need not produce any “trade secrets or commercial or financial information voluntarily provided” to the Board or the Fund “for use in developing governmental policy and upon a promise of confidentiality.” G.L.c. 4, §7, cl. twenty-sixth, 11(g). Although the Board and the Fund are private entities, it seems likely that 11(g) would allow the MBTA Retirement Board to withhold “trade secrets or commercial or financial information” to the same extent that the PRIM Board is entitled to do so. If in the future someone asked the Board to produce documents that contain trade secrets of the Board’s investment advisors, the Board would be free to argue that the equal protection principles require that public records law exemption for documents containing trade secrets. But this theoretical concern raises no serious question about whether it would be unconstitutional to enforce the public records law with respect to the Globe’s request for meeting minutes, which presumably do not disclose confidential trade secrets. Nor does it raise any serious concern about applying the public records law to any other documents that contain no trade secrets.
The only other example of differential treatment identified by the Retirement Board is that the home addresses and telephone numbers of PRIM Board employees and their family members are expressly protected against disclosure while those of Retirement Board employees are not. See G.L.c. 4, §7, cl. twenty-sixth, M(o) and (p). Personal telephone numbers are probably exempt from disclosure under the more general provision that protects “materials or data relating to a specifically named individual, the disclosure of which may constitute an unwarranted invasion of personal privacy.” Id., 1(c). Names and home addresses of adult employees would likely not be covered by this privacy exemption, because they “are not” ‘intimate details’ of a ‘highly personal nature.’ “ Cape Cod Times v. Sheriff of Barnstable Cty., 443 Mass. 587, 595 (2005) (holding that records of appointment of reserve deputy sheriffs are subject to public records law, and that names and addresses of reserve deputy sheriffs are not exempt from disclosure) (quoting Pottle v. School Comm. of Braintree, 395 Mass. 861, 865 (1985), and Hastings & Sons, 374 Mass. at 818).
But the fact that the Retirement Board might not be able to redact home addresses of its employees when producing public records, even though the PRIM Board could, also raises no serious concern that applying the public records law to the Retirement Board would violate equal protection. “Legislative line drawing . . . does not violate equal protection principles simply because it ‘is not made with mathematical nicety or because in practice it results in some inequality.’ ” Chebacco Liquor Mart, Inc. v. Alcoholic Bev *383 erages Control Comm’n, 429 Mass. 721, 723 (1999), quoting Dandridge v. Williams, 397 U.S. 471, 485 (1970), and Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78 (1911). The Board cites no case law suggesting that it differential treatment of the home addresses of different sets of employees is so irrational that it violates equal protection.
3.3.2. Taking of Property
Nor has the Retirement Board raised any serious question that being compelled to produce the meeting minutes sought by the Globe would constitute an unconstitutional taking of property without just compensation. By law the Board will be entitled to compensation for the reasonable cost of searching for, segregating, and copying the particular records requested by the Globe. See G.L.c. 66, § 10(a) 950 C.M.R. §32.06. The Board’s complaint that these fees do “not take into account the true cost of creation and maintenance of accurate, up-to-date records and electronic databases” is beside the point. The Board has no constitutional right to be compensated for the cost of preparing and storing its records and databases merely because it is required by statute to make copies of a few meeting minutes. “(J]ust compensation in the constitutional sense is what the owner has lost, not what the” party receiving the property “has gained." North Adams Apartments Ltd. Partnership v. City of North Adams, 78 Mass.App.Ct. 602, 608 (2011), quot-ing4Nichols, Eminent Domain §12.03 (rev.3d.ed. 2002). Thus, “in the case of a partial taking, the [property] owner is entitled to compensation measured, not by the fair market value of the portion taken, but by the diminution in the fair market value of his [property] caused by the partial taking.” Kane v. Town of Hudson, 7 Mass.App.Ct. 556, 559 (1979). “The measure of damages in such cases is generally the difference between the value of the plaintiffs’ [property] immediately before the taking and its value immediately after.” Id.
With respect to the Retirement Board’s argument about high-value proprietary information regarding investment strategies, it is not at all clear how that is relevant to this case. The Globe has asked for minutes of meetings at which the Board discussed the Fund’s investment in the failed hedge fund. The Board does not claim that those minutes contain any trade secrets or other valuable proprietary information. In the future, were someone to request records containing valuable trade secrets, the Board may be able to show that those portions of those records are exempt from disclosure, as discussed above. Alternatively, in such a case the Board may have a viable claim that compelling production of those particular records would constitute an unconstitutional taking of properly. But the Board’s hypothetical raises no serious question about whether the relief sought by the Globe in this case would be unconstitutional.
Finally, the Board’s assertion that the statutory right to “inspect and examine” records is tantamount to requiring the Board to allow outsiders on its premises, and thus constitutes a per se taking of properly,
is also without merit. Nothing in the public records law requires the Board to let anyone on its properly. If the Board would really prefer to bring records to some other reasonably convenient location and let requesters inspect and examine them there, it would be free to do so. Nothing in the public records law forces the Board to let people into to its offices. This argument about physical invasion of real properly raises no serious constitutional question.
3.3.3. Impairment of Contracts
At oral argument, the Retirement Board represented that it has contractual obligations to keep confidential advice provided by its investment advisors and information regarding individual Fund members. Assuming that those unproven facts are true, that would not mean that applying the public records law to the Board and the Fund will raise any serious question that the statute unconstitutionally impairs these contracts.
“A statute violates the contract clause if there is an enforceable contract that is ‘substantially impaired,’ and then only if the statute is not ‘reasonable and necessary to serve an important public purpose.’ ” MacLean v. State Bd. of Ret, 432 Mass. 339, 344 (2000), quoting Massachusetts Community College Council v. Commonwealth, 420 Mass. 126, 131 (1995) (“substantially impaired”), and United States Trust Co. v. New Jersey, 431 U.S. 1, 25 (1977). Thus, astatute “does not violate the Contract Clause simply because it has the effect of restricting, or even barring altogether, the performance of duties created by contracts entered into prior to its enactment.” HinghamHealthcareLtd. Partnership v. Division of Health Care Fin. & Policy, 439 Mass. 643, 650 (2003), quoting Exxon Corp. v. Eagerton, 462 U.S. 176, 190 (1983). “[A] finding that there has been a technical impairment” of a contractual obligation “is merely a preliminaiy step in resolving the more difficult question whether that im-' pairment is permitted under the Constitution.” United States Trust Co. of New York v. New Jersey, 431 U.S. 1, 21 (1977).
The Board has not shown there is any serious concern that the public records law will substantially impair existing contracts. With respect to investment advice that constitutes a protectable trade secret, that information appears to be exempt under the public records law for the reasons discussed above. If such information were not exempt from disclosure, the Board may be able to invoke the contract clause in order with respect to trade secrets, but that raises no serious constitutional question with respect to the relief sought by the Globe in this case. With respect to information about individual Fund members, the contracting parties are already on notice that the Retirement Board might be compelled to disclose information or communications through some governmental command, such as a subpoena, search warrant, or court order. It is unclear why requiring disclosure pursuant to the public records law rather than a court order would substantially impair the “core of’ any member’s “reason *384 able expectations” under their contract with the Fund or the Board. Cf. MacLean v. State Bd. of Retirement, 432 Mass. 339, 345 (2000) (explaining substantial impairment test), quoting Colo v. Contributory Retirement App. Bd., 37 Mass.App.Ct. 185, 189 (1994).
But even if applying the public records law to the Board and Fund would cause a severe, permanent, and immediate change" in their contractual relationships with other parties, that alone would not give rise to a viable contract clause claim. See Arthur D. Little, Inc. v. Commissioner of Health and Hospitals of Cambridge, 395 Mass. 535, 555 (1985), quoting Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 250 (1978). The statutoiy amendment would still pass constitutional muster under the contract clause so long as “it is reasonable and necessary to serve an important public purpose.” Fitch-burg Gas and Elec. Light Co. v. Department of Pub. Utils., 395 Mass. 836, 854 (1985). As the Supreme Court has emphasized, “(t]he States must possess broad power to adopt general regulatory measures without being concerned that private contracts will be impaired, or even destroyed, as a result. Otherwise, one would be able to obtain immunity from the state regulation by making private contractual arrangements.” United States Trust Co., 431 U.S. at 22; see also Champa v. Weston Pub. Sch., 473 Mass. 86, 98 (2015) (private agreement to keep information secret “cannot, by itself, trump the public records law”).
The Board has not shown there is any serious question about whether the statutoiy amendment of the public records law is reasonable and necessary to serve an important public interest. When evaluating the reasonableness of a statutoiy impairment of a contract, in cases where the State itself is not one of the contracting parties, a court must “defer to legislative . . . judgment as to the wisdom of any particular measure. Any other rule would invite parties to enter into contracts to ‘estop the legislature from enacting laws intended for the public good.’ " Arthur D. Little, 395 Mass. at 556, quoting Manigault v. Springs, 199 U.S. 473, 480 (1905); accord United States Trust Co., 431 U.S. at 23 (in making this determination, “courts properly defer to legislative judgments as to the necessity and reasonableness of a particular measure”).
3.3.4. Free Speech
The Retirement Board’s assertion during oral argument that the statutoiy amendment could have a “chilling effect” on communications between the Fund and its members does not appear to raise any serious constitutional questions either. Witnesses are often compelled, by subpoena or otherwise, to produce documents or provide testimony regarding private communications. Such an order “does not burden speech,” has no improper “chilling effect” on speech, and does not implicate any rights protected by the First Amendment to the United States Constitution. See In the Matter of the Enforcement of a Subpoena, 436 Mass. 784, 790-91 (2002) (subpoena by Commission on Judicial Conduct to spouse of judge, seeking production of documents reflection communications witness had with others, did not burden witness’s free speech rights). Similarly, the mere application of the public records law to communications between the Board and Fund members does not appear to implicate the Free Speech Clause of the First Amendment.
3.3.5. Due Process and Retroactive Application
Finally, the Retirement Board asserts that it would violate due process to apply the public records law retroactively to records made or received prior to the 2013 statutoiy amendment. That also raises no serious constitutional question. Even assuming that this statute can fairly be characterized as having retroactive effect, although that seems doubtful for the reasons discussed above, it will still “comport with . . . constitutional due process requirements” so long as it reflects a reasonable balance of “the public interest which motivated the Legislature to enact the retroactive statute the nature of the rights affected retroactively; and the extent or scope of the statutoiy effect or impact.” Leibouich v. Antonellis, 410 Mass. 568, 577 (1991); accord Gordon v. Registry of Motor Vehicles, 75 Mass.App.Ct. 47, 56 (2009). “In any evaluation of reasonableness, the objectors face a heavy burden, for we give credit to eveiy rational presumption in favor of the legislation.” In re Liquidation of Am. Mut Liab. Ins. Co., 434 Mass. 272, 282 (2001) (holding that retroactive application of statute giving workers’ compensation claims priority over claims under other insurance policies issued by insurer in liquidation was constitutional). The Board raises no serious question about whether the balance struck by the Legislature is impermissible.
ORDER
Plaintiffs motion for summary judgment is ALLOWED. Defendant’s motion for summary judgment is DENIED.
Defendant shall notify Plaintiff in writing by March 30, 2016, whether Defendant contends that (i) any additional constitutional issues must be decided in this case, or (ii) that any portion of the meeting minutes requested by Plaintiff are exempt from disclosure and, if so, disclose the basis for that contention with specificity. The parties shall then confer and attempt to agree upon a schedule for resolving any additional issues identified by Defendant. The Court will conduct a scheduling conference on April 6, 2016, at 2:00 p.m. in Courtroom 1017 to set a schedule for resolving any remaining issues, claims, or defenses in this case.

 Healy and reporters for other media outlets have also asked the Retirement Board or the Fund to produce other categories of documents. Those requests are not at issue in this case.

 he stipulated facts state that MasSTech offers its employees retirement plans under §408(k) and §457, and that CEDAC offers plans under §403(b). By statute, MSLC is authorized to offer retirement plans under §§401,408, or 457 of the Code. See G.L.c. 23, §17(l)(a).